# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| Jason Emer MD New York City, and Dr. Jason Emer, M.D.<br><br>                              Plaintiff,<br><br>-against-<br><br><br>Mason Kelley,<br><br>                              Defendant. | Index Number:<br><br>                Summons |

To the named Defendant (s):

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and serve a copy of your answer or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiffs' Attorneys within 20 days after the service of this summons. Exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York.

**YOU ARE HEREBY NOTIFIED THAT** should you fail to answer or appear; judgment will be taken against you by default for the relief demanded in the complaint.

The nature of this action is to recover compensation and damages under New York's faithless servant doctrine, breach of fiduciary duty, and fraud, arising from Defendant's unauthorized discounting, failure to follow up, and false promises to reimburse. Plaintiffs seek forfeiture and disgorgement of all compensation paid to Defendant during his employment and damages resulting from hundreds of thousands of dollars in unauthorized discounts and associated losses.

The Plaintiffs designate New York County as the place of trial. The basis of venue is that Plaintiff JASON EMER MD NEW YORK CITY maintains its principal place of business at 57 W 57th Street, Suite 611, New York, New York 10019-2815, and a substantial part of the events giving rise to these claims occurred in New York County.

A COPY OF THIS SUMMONS WAS FILED WITH THE CLERK OF THE COURT, NEW YORK COUNTY ON _____ IN COMPLIANCE WITH CPLR §§305(a) AND 306(a).

Dated: April 20, 2026
Brooklyn, New York

                              */s/Tyrone A. Blackburn*
                              Tyrone A. Blackburn, Esq.
                              1242 E. 80th Street, 3rd Floor
                              Brooklyn, NY 11236
                              Phone: 347-342-7432
                              Email: Tblackburn@tablackburnlaw.com

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| Jason Emer MD New York City, and Dr. Jason Emer, M.D.<br><br>     Plaintiff,<br><br>-against-<br><br><br>Mason Kelley,<br><br>     Defendant. | Index Number:<br><br>  Verified Complaint<br>  Jury Demand |

Plaintiffs, by and through counsel, as and for their Verified Complaint against Defendant Mason Kelley, allege upon knowledge as to their own acts and upon information and belief as to all other matters, as follows:

### Jurisdiction and Venue

1. This Court has subject matter jurisdiction because the amount in controversy exceeds the jurisdictional limits of the lower civil courts and Plaintiffs seek monetary and equitable relief available in the Supreme Court of the State of New York.

2. Venue is proper in New York County pursuant to CPLR 503 and related venue provisions because Plaintiff JASON EMER MD NEW YORK CITY maintains its principal place of business in New York County at 57 W 57TH ST, Suite 611, New York, New York 10019 2815, and a substantial part of the events giving rise to these claims occurred in New York County.

3. This action may be commenced in Supreme Court, New York County, by filing a summons and complaint, and the complaint may be verified pursuant to CPLR 3020.

### Parties

4. Plaintiff JASON EMER MD NEW YORK CITY ("Corporate Plaintiff" or the "Practice") is, upon information and belief, a medical practice with its principal place of business located at 57 W 57TH ST, Suite 611, New York, New York 10019 2815, in New York County.

5. Plaintiff Dr. Jason Emer, M.D. ("Dr. Emer") is an individual and the founder, owner, and principal physician of JASON EMER MD NEW YORK CITY, responsible for supervising employees, setting pricing policies, and bearing the financial impact of the Practice's revenues, compensation payments, discount losses, and related damages.

2

6. During Defendant's employment, all salary and payroll expenses were funded by Plaintiff JASON EMER MD NEW YORK CITY, which thereby bore the direct financial burden of Defendant's compensation.

7. To the extent Dr. Emer made personal payments, guarantees, or contributions to cover shortfalls created by Defendant's conduct, those amounts are recoverable by Dr. Emer individually.

8. Defendant Mason Kelley ("Defendant" or "Kelley") is, upon information and belief, an individual formerly employed by Plaintiffs as a concierge manager, director of sales, treatment coordinator, and/or employee with responsibility for patient intake, pricing, sales, booking, and follow up.

<u>Nature Of Action and Factual Allegations:</u>

9. This is an action for damages, restitution, disgorgement, forfeiture of compensation, and related relief arising from Defendant Mason Kelley's disloyal, unauthorized, and fraudulent conduct during his employment with Plaintiffs and/or Plaintiffs' medical practice.

10. While employed for approximately ninety days as a concierge manager and sales employee for Plaintiffs' cosmetic medical practice, Defendant exceeded the scope of his authority by granting steep and unauthorized discounts to multiple patients, including discounts stacked onto promotional pricing and discounts with no documented approval from Dr. Jason Emer.

11. New York's faithless servant doctrine provides that an employee who breaches the duty of loyalty owed to an employer forfeits compensation for the period of disloyalty and permits an employer to seek recovery of compensation and other damages caused by the employee's faithless conduct.

12. Defendant's own written communications acknowledge that he made a pricing call "on the spot," that the discounts were "not the right path," that "no discounts or exceptions" would be made going forward without Dr. Emer's "explicit review," and that he would "cover the difference" if the patient would not proceed at the corrected price.

13. Defendant further represented in writing that he would contact affected patients, correct pricing issues, and contribute personal funds to offset unauthorized discounting, yet the documentary evidence reflects no meaningful corrective follow up and shows that Plaintiffs' practice was left to bear steep unauthorized discounts, open unmanaged quotes, accounting anomalies, and lost revenue.

3

<u>Common Facts</u>

14. Plaintiffs hired Defendant in or about August 2025 to work in a managerial and sales-related role for Plaintiffs' medical practice.

15. During the course of that employment, Defendant owed Plaintiffs duties of loyalty, fidelity, good faith, candor, and obedience with respect to pricing policies, sales protocols, patient communications, financial integrity, and business operations.

16. Defendant was not authorized to grant discounts outside established practice rules, to stack discounts on existing promotions, or to otherwise alter pricing without review and approval from Dr. Emer and/or an authorized manager.

17. On September 24, 2025, Dr. Emer expressly admonished Defendant in writing that Defendant "cannot EVER give anyone a discount without reviewing with me first," that Defendant could not "put a discount on the buy 3 to get one free," and that Dr. Emer needed the matter reviewed with him.

18. In the same exchange, Dr. Emer further stated that he was "very concerned," that Defendant could not "keep doing" what he was doing, and that Defendant was "not doing what I want you to do."

19. Defendant responded in writing and admitted: "On the discount confusion, I did discuss pricing with Jordan first, and we tried to do the best we could in the moment. You don't want to lose a sale by being clunky over the phone, so I made a call on the spot; clearly that wasn't the right path."

20. Defendant further admitted in writing: "Going forward, no discounts or exceptions, especially on 'buy 3, get 1 free' will be made without your explicit review."

21. Defendant also wrote: "First thing tomorrow, I'll call the patient, own the pricing error, and align with your policy. If he won't proceed at the corrected price, I'll cover the difference on this one to keep us from setting a precedent or prolonging the issue."

22. In a related communication concerning patient Randy Blackwell, Defendant represented in writing that the "current discounts are beyond standard," and included an internal note stating: "I will contribute out-of-pocket to help patient meet the $10,600 Round-1 target."

23. Upon information and belief, Defendant's written admissions were not isolated to a single patient but reflected a broader course of conduct in which Defendant granted steep and unauthorized discounts to multiple patients during his employment.

4

24. A forensic audit prepared from the practice's live Salesforce database, invoice records, quote line items, task logs, and appointment records concluded that Defendant gave approximately $332,912 in discounts across 52 quotes during the relevant employment window, with no documented approval authority for those discounts.

25. The same audit concluded that Defendant's title was "Concierge Manager," that the only person with "Sales Manager" title was Jose Bodon-Orsini, and that discount authority resided with Jose Bodon-Orsini and Dr. Emer rather than Defendant.

26. The audit also identified specific steep discount transactions, including a Randy Blackwell quote with a $5,461 discount, another Randy Blackwell quote with a $5,935 discount, a Christine McCann quote with a 55.5% discount and no documented reason, and multiple other discounted quotes lacking documented approval.

27. In addition, the audit identified open quotes for patient Marie Kuehne that reflected approximately $82,300 in total discounts and 40 vials of Sculptra priced at zero net value, which the audit flagged as unauthorized or unsupported by documented approval.

28. The audit further found three invoices where the discount amount exceeded the amount collected, including invoices for Elena Safavi and Nathan Zolecki under Defendant's ownership and coordinator name, thereby creating accounting anomalies and direct loss to Plaintiffs' practice.

29. Despite Defendant's promise to call the patient, correct the pricing issue, and personally cover the difference, the documentary record reflects no meaningful corrective follow-up by Defendant.

30. Specifically, the audit found that, during Defendant's employment, there were 49 logged tasks, of which 47 were automated payment-receipt emails, one was an automated invoice email, one manual call task remained open and never completed, and Defendant generated zero proactive follow-up tasks over three months.

31. The audit concluded that Defendant created 161 quotes, left 103 of them unresolved and open, maintained a 64% open-quote rate, and generated no documented proactive outreach, no quote follow-up tasks, and no prospect follow-up communications for those open quotes.

32. The audit likewise states that many of Defendant's quotes were "created and never touched again," "same-day abandoned," or "never followed up," and that the open quote value in Defendant's portfolio exceeded approximately $1.6 million.

5

Case 1:26-cv-05862   Document 1-1   Filed 07/10/26   Page 7 of 18

33. Accordingly, rather than curing the pricing issues he admitted, Defendant left Plaintiffs to bear the consequences of steep unauthorized discounts, unmanaged patient pricing, stale quotes, accounting anomalies, lost revenue, and the costs of remediation.

34. Plaintiffs have been damaged in an amount to be determined at trial, including but not limited to compensation paid to Defendant during the period of disloyalty, losses attributable to unauthorized discounts, investigative and remediation costs, and other consequential damages. To the extent discount-related revenue losses and pipeline losses were borne on the books of JASON EMER MD NEW YORK CITY, those amounts are recoverable by the Corporate Plaintiff; to the extent Dr. Emer personally contributed funds or assumed obligations to cover shortfalls, those amounts are recoverable by Dr. Emer individually.

FIRST CAUSE OF ACTION
Faithless Servant Doctrine
(Against Defendant Mason Kelley)

35. Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

36. At all relevant times, an employer–employee relationship existed between Plaintiffs and Defendant, pursuant to which Defendant was employed as a concierge manager, director of sales, and/or treatment coordinator with responsibility for handling prospective patients, communicating pricing and treatment plans, preparing and maintaining quotes and invoices, and facilitating the conversion of consultations into paid treatments.

37. By virtue of this employment relationship, Defendant owed Plaintiffs a duty of loyalty and faithful service, including the obligation to:

    (a) follow established pricing and discount policies.
    (b) refrain from granting unauthorized discounts or concessions.
    (c) accurately and fully disclose material information regarding pricing and discounts to Dr. Emer and the Practice.
    (d) work diligently to convert quotes into revenue; and
    (e) act at all times in the best interests of Plaintiffs and their patients, rather than in his own personal interest.

38. New York's faithless servant doctrine provides that an employee who is disloyal or acts in bad faith toward his employer, whether through repeated acts of disloyalty or a single act that is so egregious as to "permeate" the employment relationship, may be required to forfeit the compensation received during the period of disloyalty, regardless of whether the employer also suffered independent losses.

6

Case 1:26-cv-05862 Document 1-1 Filed 07/10/26 Page 8 of 18

39. Defendant's conduct during his approximately ninety-day tenure constituted a sustained pattern of disloyalty that went to the heart of his job responsibilities and fundamentally undermined Plaintiffs' trust, including, without limitation:

   a. Granting steep, unauthorized discounts on at least 52 quotes totaling roughly $332,912 in discounts, often without any documented reason or approval, and contrary to instructions that he "cannot EVER give anyone a discount without reviewing with me first."

   b. Stacking discounts on top of existing promotions (including "buy 3, get 1 free" offers) in direct contravention of Dr. Emer's written directives, thereby exposing the Practice to pricing precedent and revenue erosion.

   c. Creating high-value quotes—some in the six-figure range—and then failing to follow up, leaving 103 out of 161 quotes open, with many "created and never touched again," which reflects a deliberate disregard of his core duty to work and convert the Practice's pipeline.

   d. Leaving substantial open quote value—estimated at over $1.6 million—in a dormant state, with no documented proactive outreach, while continuing to draw compensation from Plaintiffs.

   e. Failing to correct or disclose serious discount anomalies, including invoices where the discount amount exceeded the collected amount, thereby creating accounting irregularities that placed Plaintiffs at financial and compliance risk.

   f. Making written promises to "own the pricing error," "align with your policy," and personally "cover the difference" when confronted about unauthorized discounts, which he then failed to honor, leaving Plaintiffs to bear the losses while preserving his own compensation.

40. Defendant's disloyal conduct was not incidental or peripheral; it directly involved the core functions for which he was hired—pricing, sales, and patient conversion—and was carried out repeatedly over the course of his short employment, including in the face of explicit, written warnings from Dr. Emer about his misuse of discounting authority.

41. Defendant's actions placed his own interests—closing deals on terms he chose, protecting his sales image with patients, and avoiding immediate discipline—above the clearly communicated interests of Plaintiffs, who emphasized long-term reputation, regulatory compliance, and financial integrity.

42. The combination of:

   (a) unauthorized discounts on dozens of quotes.

   (b) systemic failure to follow up on quotes and patient opportunities.

   (c) creation and abandonment of high-value quotes.

   (d) discount irregularities on invoices; and

   (e) false assurances that he would fix and reimburse the problems when confronted, renders Defendant's performance pervasively disloyal and satisfies the standards under New York's faithless servant doctrine.

7

43. As a direct and proximate result of Defendant's faithless service, Plaintiffs:

    a. Paid Defendant salary, wages, and/or commissions during a period when he was acting disloyally and contrary to their interests.
    b. Suffered substantial discount-related revenue losses and exposure from unauthorized discounts that were never approved, reversed, or recouped.
    c. Incurred additional administrative, forensic, and legal costs to analyze and remediate the damage caused by Defendant's discounting, quoting, and invoicing practices.

44. Under New York law, when an employee is found to be a faithless servant, the employer is entitled to recover all compensation paid to that employee during the period of faithlessness, without any requirement to parse out which tasks were performed loyally, and which were disloyal.

45. Upon information and belief, Defendant's unauthorized discounting and failure to adhere to Plaintiffs' pricing policies began shortly after his hire in or about August 2025, and continued, without meaningful interruption, throughout his employment.

46. Plaintiffs are therefore entitled to recover from Defendant, at a minimum, the full amount of salary, wages, commissions, bonuses, and any other compensation paid to Defendant during his approximately ninety-day tenure with Plaintiffs, together with pre-judgment interest on such sums, and without prejudice to Plaintiffs' right to recover additional consequential damages caused by Defendant's misconduct..

47. Plaintiffs are also entitled to equitable relief, including disgorgement and restitution, and to an award of costs and such other and further relief as the Court deems just and proper considering Defendant's faithless service.

SECOND CAUSE OF ACTION
Breach of Fiduciary Duty / Duty of Loyalty
(Against Defendant Mason Kelley)

48. Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

49. At all relevant times, Defendant was employed by Plaintiffs in a trusted role as concierge manager, director of sales, and/or treatment coordinator, with direct responsibility for sensitive aspects of Plaintiffs' business, including:

    a. Communicating treatment options and pricing to patients and prospects.
    b. Preparing, modifying, and presenting quotes and invoices.
    c. Handling patients' confidential information and financial arrangements.
    d. Managing Plaintiffs' sales pipeline and follow up on high value opportunities.

8

50. By virtue of this role, Defendant stood in a position of special trust and confidence with respect to Plaintiffs and owed Plaintiffs fiduciary duties and duties of loyalty, including, without limitation, the duties to:

    a. Act in Plaintiffs' best interests in all matters relating to his employment.

    b. Comply with established pricing and discount policies and with direct instructions from Dr. Emer and the Practice.

    c. Fully and honestly disclose material information about discounts, pricing, and patient communications.

    d. Refrain from self-dealing, concealment, or conduct that would harm Plaintiffs' financial, reputational, or regulatory interests.

51. Defendant breached his fiduciary duties and duties of loyalty to Plaintiffs through a continuing course of conduct during his approximately ninety-day employment, including but not limited to the following:

    a. Granting steep and unauthorized discounts on dozens of quotes, including discounts totaling hundreds of thousands of dollars, without obtaining the approvals required by Plaintiffs' written policies and explicit instructions.

    b. Stacking discounts on top of "buy 3, get 1 free" and other promotions, despite being expressly told by Dr. Emer that such conduct was not permitted and that "you cannot EVER give anyone a discount without reviewing with me first."

    c. Failing to disclose, in a full and timely manner, the scope and financial impact of his discounting practices, including the extent to which discounts deviated from standard policies and created precedent or expectation among patients.

    d. Creating and then failing to work, follow up, or close a very large number of quotes, leaving a substantial portion of Plaintiffs' sales pipeline dormant and unmonetized while continuing to draw compensation.

    e. Allowing discount anomalies and invoices where the discount exceeded the amount collected to remain uncorrected, exposing Plaintiffs to direct financial losses and accounting irregularities.

    f. Making written assurances that he would "own the pricing error," "align with your policy," and personally "cover the difference," and then failing to take those corrective and remedial steps, thereby deepening Plaintiffs' losses while attempting to assuage Dr. Emer's concerns about his conduct.

52. Defendant's breaches were knowing, willful, and in conscious disregard of Plaintiffs' rights and explicit directives and were not mere errors of judgment or isolated mistakes. They involved the core of the fiduciary responsibilities entrusted to him-pricing integrity, patient communications, and revenue generation.

53. As a direct and proximate result of Defendant's breaches of fiduciary duty and duty of loyalty, Plaintiffs have suffered damages, including but not limited to:

    a. Lost revenue and profit from unauthorized discounts, discount stacking, and underpricing of treatments.

9

b. Losses from uncorrected invoices and discount anomalies that required write offs, adjustments, or other financial remediation.

c. Lost business opportunities and diminished pipeline conversion resulting from Defendant's failure to follow up on quotes and effectively manage patient relationships.

d. Compensation paid to Defendant during the period he was acting contrary to Plaintiffs' interests.

e. Costs and expenses incurred in investigating, auditing, and correcting Defendant's misconduct, including forensic review of quotes and invoices and professional fees.

54. Defendant's conduct was so inconsistent with the duty of loyalty owed to Plaintiffs that equity and good conscience require that he be held personally liable for all damages caused by his breaches, and that he be compelled to disgorge any benefits or compensation obtained in connection with such breaches.

55. This Second Cause of Action seeks compensatory damages and equitable relief for specific financial losses and harms caused by Defendant's breaches, separate from and in addition to the equitable forfeiture of compensation sought under the First Cause of Action.

56. Plaintiffs are therefore entitled to:

a. Compensatory damages in an amount to be determined at trial, representing all losses proximately caused by Defendant's breaches of fiduciary duty and loyalty.

b. Disgorgement of any unjust benefits, commissions, or other compensation obtained by Defendant because of his wrongful conduct.

c. Pre judgment interest, together with costs and disbursements of this action.

d. Such other and further legal and equitable relief, including an accounting, if necessary, as the Court deems just and proper considering Defendant's breaches.

THIRD CAUSE OF ACTION
Fraud
(Against Defendant Mason Kelley)

57. Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

58. On or about September 24, 2025, during an email exchange initiated by Dr. Emer concerning Defendant's unauthorized discounting and deficient documentation for patient Randy Blackwell, Defendant sent a written response from his work email address (mason@jasonemermd.com) to Dr. Emer (jason.emer.md@gmail.com) in which he made specific representations regarding what he would do to remedy the unauthorized discounts.

59. In that September 24, 2025, email, Defendant admitted to having made a pricing decision "on the spot" and then stated, in substance and in part:

a. "First thing tomorrow, I'll call the patient, own the pricing error, and align with your policy."

10

    b. "If he won't proceed at the corrected price, I'll cover the difference on this one to keep us from setting a precedent or prolonging the issue."

60. In a related written communication concerning the same patient, Defendant further acknowledged that the "current discounts are beyond standard" and added an internal coordinator note that: "I will contribute out-of-pocket to help patient meet the $10,600 Round-1 target."

61. These statements, taken together, were specific, factual representations of Defendant's then-present intent to (a) immediately contact the patient, (b) correct the pricing discrepancy with that patient and others, and (c) personally reimburse Plaintiffs for any shortfall caused by the unauthorized discounts if the patient refused to pay the corrected amount.

62. At the time Defendant made these representations on September 24, 2025, and at the time of his related internal note concerning the $10,600 target, Defendant knew that he did not, in fact, intend to (a) contact all affected patients as promised, (b) reverse or correct the unauthorized discounts he had already granted, or (c) reimburse Plaintiffs for the shortfalls; alternatively, he made the statements with reckless disregard for whether he would actually do so.

63. Defendant made these representations in direct response to Dr. Emer's written warnings that Defendant could not "EVER give anyone a discount without reviewing with me first," that discounts could not be stacked on "buy 3, get 1 free" offers, and that Defendant was "not doing what I want you to do," and for the purpose of persuading Plaintiffs not to immediately undo his discounts, not to intervene directly with patients, and not to terminate or otherwise discipline him at that time.

64. Plaintiffs reasonably and justifiably relied on Defendant's September 24, 2025, representations in that, in reliance on Defendant's promise to "call the patient," "own the pricing error," "align with your policy," and "cover the difference":

    a. Plaintiffs did not immediately reverse or remove the unauthorized discounts that Defendant had applied to Randy Blackwell and other patients.
    b. Plaintiffs did not immediately contact Randy Blackwell and other affected patients themselves, or through other staff, to correct the pricing and seek full payment in accordance with established policies.
    c. Plaintiffs allowed Defendant to remain in his position and continued to pay him compensation after September 24, 2025, expecting that he would perform the remedial actions he had committed to.

11

65. Subsequent objective records show that Defendant did not perform the remedial actions he represented he would perform, thereby confirming that his earlier statements were false when made:

    a. A forensic review of Defendant's task/activity log shows zero proactive follow-up tasks created by Defendant during his roughly three-month employment, and only one manual call task (for another patient) left in "Open" status and never completed. There is no log entry showing that Defendant created or completed follow-up tasks reflecting the promised corrective calls to patients.

    b. The same review shows that Defendant left 103 out of 161 quotes open, with a 64% open-quote rate and many quotes "created and never touched again," corroborating that he did not undertake the promised corrective outreach to fix unauthorized pricing or convert those quotes in accordance with practice policy.

    c. The audit further shows that the steep, unauthorized discounts in Defendant's quotes and invoices—including the large discounts for Randy Blackwell and others—remained in place and were not reversed or offset by any documented reimbursement from Defendant.

66. Plaintiffs' reliance on Defendant's misrepresentations caused additional, incremental damages beyond the baseline harm from Defendant's underlying disloyalty and poor performance, including but not limited to:

    a. Additional salary, wages, commissions, or other compensation paid to Defendant after September 24, 2025, during the period when Plaintiffs would have suspended, reassigned, or terminated Defendant but for his assurances that he would fix the problem and reimburse any shortfalls.

    b. Additional discount losses and uncorrected invoice anomalies that would have been reduced or avoided if, instead of relying on Defendant's promises, Plaintiffs had immediately removed or renegotiated the unauthorized discounts and directly re-engaged the patients.

    c. Additional administrative, investigative, and remediation costs incurred in addressing and unwinding discounts and anomalies that could have been minimized if Plaintiffs had acted promptly rather than waiting for Defendant to implement the promised corrections.

67. Defendant's September 24, 2025, representations, and his related internal note about contributing "out-of-pocket," were therefore materially false statements of present intention made with the intent to deceive Plaintiffs, Plaintiffs' justifiable reliance on those statements caused them concrete out-of-pocket losses, and Defendant is liable to Plaintiffs under New York law for common-law fraud.

68. As a result of Defendant's fraud, Plaintiffs are entitled to recover compensatory damages in an amount to be determined at trial, together with pre-judgment interest and such further relief as

12

the Court deems just and proper, separate and apart from the remedies available to Plaintiffs on their faithless-servant and fiduciary-duty claims.

<u>Prayer for Relief</u>

69. WHEREFORE, Plaintiffs respectfully demand judgment against Defendant as follows:

    a. On the First Cause of Action, awarding Plaintiffs forfeiture, disgorgement, and restitution of all salary, wages, commissions, bonuses, and all other compensation paid to Defendant during the period of his faithlessness, in an amount to be determined at trial.

    b. Awarding Plaintiffs compensatory damages in an amount to be determined at trial, including but not limited to losses caused by unauthorized discounts, invoice anomalies, abandoned and unmanaged quotes, and related economic harm.

    c. Awarding Plaintiffs compensatory damages for Defendant's fraud, including out-of-pocket losses caused by Plaintiffs' reliance on Defendant's misrepresentations regarding reimbursement and corrective patient contact.

    d. fully Awarding pre-judgment and post-judgment interest permitted by law.

    e. Awarding costs, disbursements, and such other and further relief as the Court deems just and proper.

    f. Granting such equitable relief, including accounting, restitution, and disgorgement, as may be warranted by Defendant's conduct.

<u>Jury Demand</u>

Plaintiffs demand a jury trial on all issues triable by a jury.

Dated: April 20, 2026
Brooklyn, New York

                                             */s/Tyrone A. Blackburn*
                                             Tyrone A. Blackburn, Esq.
                                             1242 E. 80th Street, 3rd Floor
                                           Brooklyn, NY 11236
                                           Phone: 347-342-7432
                                           Email: Tblackburn@tablackburnlaw.com

13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| Jason Emer MD New York City, and Dr. Jason Emer, M.D. <br><br> Plaintiff, <br><br> -against- <br><br> Mason Kelley, <br><br> Defendant. | Index Number: <br><br> Certificate Of Merit |

To the above-named defendant (s):

TYRONE A. BLACKBURN, being duly sworn, deposes and states the following to be true under the penalties of perjury of the State of New York. I have reviewed the facts of this case and have concluded, based on the review, that there is a reasonable basis for the commencement of this action.

Dated: April 20, 2026
Brooklyn, New York

/s/Tyrone A. Blackburn
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com

14

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| Jason Emer MD New York City, and<br>Dr. Jason Emer, M.D.<br><br>        **Plaintiff,**<br><br>-against-<br><br><br>Mason Kelley,<br><br>        **Defendant.** | Index Number:<br><br>   Attorney Verification |

To the above-named Defendant (s):

TYRONE A. BLACKBURN, an attorney duly admitted to practice in the Courts of New York State and a member of the firm T. A. Blackburn Law, PLLC., attorneys for the plaintiffs in this action, affirms under penalty of perjury, That he has read the complaint and knows the contents thereof and that the same is true to his knowledge, except as to the matters therein stated to be alleged upon information and belief, and that as to those matters, he believes it to be true. The sources of his information and knowledge are investigations and records in the file. This verification is made by affirmation and not by the plaintiffs because the Plaintiffs are not within the County where the attorney has his office.

Dated: April 20, 2026
Brooklyn, New York

              */s/Tyrone A. Blackburn*
              Tyrone A. Blackburn, Esq.
              1242 E. 80th Street, 3rd Floor
              Brooklyn, NY 11236
              Phone: 347-342-7432
              Email: Tblackburn@tablackburnlaw.com

15

## PRESERVATION NOTICE

The term "you," "your," or "yours" as used herein shall refer to you (Mason Kelley), as well as to the respondents and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors. From this point forward, you are directed to prevent any "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any of the information set forth hereafter.

If you cause any such alteration, destruction, or change, direct it or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed. Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation.

Electronically Stored Information:

In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, CDs, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses. This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to-any such electronically stored information. You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

Paper Information:

In terms of the paper information, you are directed to preserve any and all emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents which pertain in any way to the controversy, parties, or witnesses in this matter. Through discovery, we expect to obtain from you a number of documents and other data, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court for order-preserving documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery on this case arises independently from any order on such motion. Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we will likely seek all documents in their original, electronic form,

along with metadata or information about those documents on the media. We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence. Due to its format, electronic information is quickly deleted, modified, or corrupted. Accordingly, the demand is made that you take every reasonable step to preserve this information until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Relevant evidence regarding electronic data created after this complaint's delivery date should not be destroyed. You must take the steps necessary to prevent the destruction of such evidence.

Dated: April 20, 2026
Brooklyn, New York

/s/Tyrone A. Blackburn
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com

## DEMAND FOR INSURANCE COVERAGE

Defendants are demanded to provide a complete copy of their applicable insurance policies and declaration sheets demonstrating coverage within thirty (30) days of service of this Complaint.

Dated: April 20, 2026
Brooklyn, New York

/s/Tyrone A. Blackburn
Tyrone A. Blackburn, Esq.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Phone: 347-342-7432
Email: Tblackburn@tablackburnlaw.com

17