U.S. DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jason J. Emer, MD,<br>Professional Corporation d/b/a<br>Jason Emer MD New York City, and<br>Jason J. Emer, M.D.,<br>Plaintiffs,<br>v.<br><br>Mason Kelley,<br>Defendant. | Case No. 1:26-cv-05862-JSR<br><br>First Amended Complaint<br>Trial by Jury |

Plaintiffs Jason J. Emer, MD, Professional Corporation, doing business as Jason Emer MD New York City (the "PC" or the "Practice"), and Jason J. Emer, M.D. ("Dr. Emer" and, together with the PC, "Plaintiffs"), by and through their attorneys, T.A. Blackburn Law, PLLC, as and for their Amended Verified Complaint against Defendant Mason Kelley ("Kelley" or "Defendant"), allege as follows:

**NATURE OF THE ACTION**

1. This action arises from Defendant Mason Kelley's approximately ninety-day employment by the Practice, during which he rapidly advanced from Concierge Center Manager & Inbound Sales to Head of Sales, a senior managerial position carrying substantial responsibility over the Practice's sales operations, personnel, patient relationships, and revenue-generating activity. While occupying that position of trust, Kelley knowingly exceeded his pricing authority, extended hundreds of thousands of dollars in unauthorized patient discounts, concealed the scope and financial consequences of that conduct, and thereafter made materially false assurances directly to Dr. Emer concerning remediation in order to protect his recently obtained position and substantial compensation. Kelley's conduct caused substantial losses to the PC and separately caused Dr. Emer to sustain actual out-of-pocket pecuniary loss from his personal funds. Plaintiffs bring claims for faithless-servant forfeiture, breach of fiduciary duty, and common-law fraud.

**THE PARTIES**

2. Plaintiff Jason J. Emer, MD, Professional Corporation is a professional corporation organized and existing under the laws of the State of California, with its principal office located at 9201 Sunset Boulevard, West Hollywood, California.
3. The PC transacts business in New York under the assumed name "Jason Emer MD New York City," through which it operates a satellite medical office located at 57 West 57th Street, Suite 611, New York, New York. For purposes of citizenship, the PC is a citizen of

the State of California, where it is incorporated and where its principal place of business is located.

4. "Jason Emer MD New York City," as identified in the original Complaint, is and at all relevant times has been the assumed business name of the PC and is not a separate legal entity. Identification of the PC by its complete legal name in this Amended Complaint clarifies the identity of the originally named Plaintiff and does not add or substitute a new plaintiff.
5. At the commencement of this action, at the time of removal, and continuously thereafter, Dr. Emer was domiciled in and a citizen of California. Plaintiff Jason J. Emer, M.D. is a natural person who is, and at all relevant times was, domiciled in and a citizen of the State of California. Plaintiff Emer is domiciled at 2519 Chislehurst Place, Los Angeles, California 90027.
6. Dr. Emer resides in Los Angeles County, California; is licensed to practice medicine in California; is a registered voter in Los Angeles County, California (**See Exhibit A**); maintains his primary home, his principal professional practice, and the center of his personal and financial life in California; and intends to remain in California indefinitely.
7. Dr. Emer is the sole shareholder, director, and principal physician of the PC.
8. Upon information and belief, Defendant Mason Kelley is a natural person domiciled in and a citizen of the State of California, residing in Los Angeles County, California.
9. Upon information and belief, Defendant Kelley is domiciled at 115 Sunridge St, Los Angeles, CA 90293. (**See Exhibit B**).
10. This action was commenced in the Supreme Court of the State of New York, County of New York, and thereafter removed by Defendant to the United States District Court for the Southern District of New York. Plaintiffs dispute that federal subject-matter jurisdiction exists and have sought remand. At the commencement of this action and at the time of removal, Plaintiff Dr. Emer and Defendant Kelley were both domiciled in and citizens of California, and the PC was likewise a citizen of California because it was incorporated in California and maintained its principal place of business there. Complete diversity therefore did not exist under 28 U.S.C. § 1332(a). Plaintiffs file this Amended Complaint without waiving their jurisdictional objections or request for remand.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction because Plaintiffs' claims arise under the common law of the State of New York and this is a court of general jurisdiction. This action

does not fall within the diversity jurisdiction of the federal courts under 28 U.S.C. § 1332(a): both Plaintiffs—the PC and Dr. Emer—are citizens of California, and Defendant Kelley is likewise a citizen of California. Because Plaintiffs and Defendant are citizens of the same State, complete diversity is absent and this action is not removable.

12. This Court has personal jurisdiction over Defendant because the conduct giving rise to Plaintiffs' claims includes acts directed at and injuries sustained in New York, including unauthorized discounts extended to, and communications concerning, patients of the Practice's New York office, and Defendant's in-person work at that office.

13. Venue is proper in New York County under CPLR 503 because a substantial part of the events giving rise to the claims occurred at the Practice's office located at 57 West 57th Street, Suite 611, New York, New York.

## FACTUAL ALLEGATIONS

### A. Defendant's Employment, Authority, Compensation, and Duties

14. Dr. Emer founded, owns, and operates the Practice. Dr. Emer was personally involved in Defendant's hiring, employment, supervision, promotion, compensation, and continued employment and exercised ultimate supervisory authority over Defendant's work.

15. Defendant commenced employment with the Practice in or about August 2025 as Concierge Center Manager & Inbound Sales. Defendant's written employment offer expressly characterized the position as carrying "considerable responsibility" and being "integral to the continued success" of the Practice.

16. Defendant initially received a base annual salary of approximately $120,000 together with substantial incentive compensation directly tied to sales and collections. Among other things, Defendant was eligible for monthly incentive compensation based upon Professional Services that Defendant individually sold, that were subsequently performed, and for which the Practice actually collected payment.

17. Defendant therefore had access to and responsibility concerning commercially sensitive patient and sales information, including patient inquiries, treatment opportunities, pricing information, anticipated collections, sales performance, patient follow-up, and transactions capable of generating substantial revenue for the Practice.

18. Effective approximately September 2, 2025, Defendant was promoted to Head of Sales. In connection with that promotion, Defendant's annual base salary increased from approximately $120,000 to approximately $200,000.

19. As Head of Sales, Defendant expressly assumed "full leadership responsibility for the sales department," including direct oversight of Treatment Coordinators, Apprentice Treatment Coordinators, Providers, and Call Center/Inside Sales personnel.
20. Defendant was expressly accountable for ensuring that the Practice's sales personnel performed to expectation, adhered to company processes, and generated results consistent with the Practice's business goals. Defendant was therefore not merely a ministerial salesperson or clerical employee. He occupied a senior position of substantial trust, responsibility, discretion, and access concerning the Practice's patient relationships, sales operations, pricing activity, collections, and sales personnel.
21. Defendant's compensation as Head of Sales was also directly connected to the financial performance of the sales department. In addition to his $200,000 annual base salary, Defendant was eligible to receive a monthly performance bonus equal to one percent (1%) of the sales team's collected sales revenue whenever the team met or exceeded the Practice's monthly sales target. For example, at a projected monthly target of approximately $2.6 million, Defendant stood to receive an additional approximately $26,000 for that month.
22. Defendant thus had a concrete and substantial personal financial interest in maintaining his position as Head of Sales, preserving his $200,000 salary, maximizing sales and collections, satisfying applicable performance thresholds, and remaining eligible for substantial incentive compensation.
23. Upon information and belief, Defendant understood those compensation incentives and knew that disclosure of substantial unauthorized pricing concessions, violations of Practice pricing requirements, or other conduct demonstrating that he had failed to adhere to the Practice's sales processes would jeopardize his recently obtained Head of Sales position, his $200,000 annual salary, and his eligibility for substantial incentive compensation.
24. Upon information and belief, Defendant therefore had both a personal financial motive and an opportunity to conceal unauthorized pricing activity from Plaintiffs and, once that activity began to surface, to minimize its extent and induce Dr. Emer to permit Defendant to remain employed while Defendant purportedly corrected the problem.

B. **Unauthorized Discounts and Abuse of Defendant's Position**

25. Defendant's authority over the sales operation did not authorize him to disregard the Practice's established pricing, extend extraordinary patient discounts without required approval, or otherwise materially reduce amounts due for medical procedures and services contrary to established Practice processes.

26. Upon information and belief, Defendant knew the scope and limitations of his pricing authority. That inference is supported by, among other things, Defendant's senior sales position; his responsibility for ensuring adherence to company processes; his access to sales and financial performance information; his responsibility for supervising other sales personnel; and the repeated and substantial nature of the unauthorized pricing concessions at issue.
27. Notwithstanding those duties, Defendant repeatedly caused or authorized substantial discounts outside the scope of his authority and contrary to the pricing and approval processes Defendant himself was charged with following and enforcing.
28. Plaintiffs' presently available patient-account and financial records reflect approximately $332,912 in unauthorized discounts associated with completed procedures and approximately $82,300 relating to additional services and treatment opportunities.
29. A substantial portion of Defendant's unauthorized pricing activity concerned patients of the Practice's New York office, services to be provided through the New York Practice, and revenue attributable to the Practice's New York operations.
30. Defendant communicated with New York patients and Practice personnel concerning pricing, patient coordination, and sales activity and, on occasions during his employment, performed work physically from the Practice's New York County office.
31. Defendant's unauthorized pricing activity therefore directly affected patient accounts, receivables, and revenue associated with the Practice's New York operations.
32. Upon information and belief, Defendant used unauthorized pricing concessions, at least in part, to facilitate or accelerate patient conversions and sales activity, thereby increasing or attempting to increase the collected sales activity upon which Defendant's own performance, continued employment, and potential incentive compensation depended.
33. Upon information and belief, Defendant knew that disclosure of the full extent of those pricing concessions would reveal that he had acted outside the scope of his authority, failed to adhere to the very company processes he was responsible for enforcing, exposed the Practice to substantial financial loss, and placed his recently obtained Head of Sales position and compensation in jeopardy.
34. Defendant therefore failed timely to disclose to Dr. Emer the existence, number, scope, and aggregate financial magnitude of the unauthorized discounts and permitted Dr. Emer and the Practice to continue operating without knowledge of the true financial exposure Defendant had created.

C. **Defendant's September 24, 2025, Fraudulent Representations and Concealment**

35. On or about September 24, 2025, less than one month after Defendant assumed the position of Head of Sales, Dr. Emer began confronting Defendant concerning unauthorized pricing that had begun to surface.
36. During direct communications with Dr. Emer on or about September 24, 2025, including email communications and direct oral communications between Defendant and Dr. Emer, Defendant represented that he would "call the patient," "own the pricing error," and "cover the difference."
37. The September 24 communications initially concerned a pricing discrepancy involving a Practice patient identified herein as “Patient A,” as to whom Defendant represented that he would personally contact the patient, accept responsibility for the pricing error, and cover the resulting difference.
38. Those statements were made by Defendant personally to Dr. Emer while Defendant was serving as Head of Sales and while Defendant knew that Dr. Emer was determining what immediate corrective and disciplinary measures were required.
39. Defendant did not disclose to Dr. Emer that the pricing problem was substantially broader than an isolated error. Upon information and belief, at the time Defendant made the September 24 representations, Defendant knew that he had engaged in additional unauthorized pricing activity affecting other patient accounts and knew that the aggregate financial exposure was materially greater than the particular pricing discrepancy then being discussed.
40. Having undertaken to explain and purportedly remedy his unauthorized pricing conduct—and having occupied the Head of Sales position in which he was charged with adhering to and enforcing company sales processes—Defendant knowingly failed to disclose the full scope of his own unauthorized activity.
41. Upon information and belief, Defendant's representation that he would remedy the pricing errors and "cover the difference" was false when made because Defendant did not then intend to perform the promised remediation or personally absorb the financial consequences of his conduct.
42. The inference of Defendant's contemporaneous fraudulent intent is supported by particularized circumstances, including that:
    (a) Defendant had recently obtained a promotion carrying a $200,000 annual salary;
    (b) Defendant was eligible for substantial incentive compensation directly associated with the sales department's collected revenue;

(c) disclosure of the full scope of the unauthorized discounts threatened his continued employment, compensation, and recently obtained Head of Sales position;
(d) Defendant knew that he himself had generated, approved, communicated, or caused the pricing concessions and therefore possessed information concerning their scope that Dr. Emer did not possess;
(e) Defendant did not voluntarily disclose the complete scope of that conduct before it began to surface;
(f) Defendant made his assurances only after Dr. Emer began questioning the pricing discrepancies;
(g) Defendant thereafter failed to perform the remediation he expressly promised; and
(h) Defendant did not "cover the difference" as he represented that he would.

43. Upon information and belief, Defendant made those representations and material omissions with the specific intent to cause Dr. Emer to believe that Defendant would personally resolve the pricing problem, thereby preventing or delaying Defendant's immediate termination and allowing Defendant to continue receiving the salary and other benefits associated with his employment.

44. Dr. Emer actually and reasonably relied upon Defendant's representations. In reliance upon Defendant's express assurance that he would correct the pricing problems, contact affected patients, accept responsibility, and cover the resulting difference, Dr. Emer temporarily refrained from immediately terminating Defendant and from personally taking complete control over all affected patient accounts.

45. During the resulting period of reliance, Dr. Emer also personally used funds belonging to him individually to satisfy payroll, rent, and other operating obligations that the Practice was unable timely to satisfy because of the financial shortfall associated with Defendant's unauthorized pricing activity.

46. Those payments were made from Dr. Emer's personal funds and personal accounts, reduced Dr. Emer's personal assets dollar-for-dollar and constituted an actual out-of-pocket pecuniary loss to Dr. Emer separate from any diminution in value of his ownership interest in the Practice.

47. Dr. Emer was not personally obligated merely by virtue of his shareholder status to satisfy those corporate operating expenses from his individual assets. Rather, Dr. Emer personally parted with his property while acting in reliance upon Defendant's assurances that Defendant was accepting responsibility for and would remedy the pricing problem.

48. Had Defendant disclosed the truth—including that he did not intend to perform the promised remediation and that the unauthorized pricing activity was materially broader than Defendant represented—Dr. Emer would have terminated Defendant immediately, personally intervened in the affected patient accounts, undertaken available mitigation

measures without awaiting Defendant's purported cure, and would not have continued the same course of personal expenditures in reliance upon Defendant's assurances.

49. Immediate truthful disclosure would have permitted Dr. Emer to stop additional unauthorized pricing, promptly contact affected patients, seek collection of correct balances, reverse or renegotiate unconsummated discounts, suspend further transactions, and implement other measures before additional losses became fixed. The delay caused by Defendant Kelley's representations deprived Dr. Emer of those mitigation opportunities and caused him to make personal expenditures he otherwise would have avoided.

**FIRST CAUSE OF ACTION**
**(Faithless Servant — On Behalf of the PC)**

50. Plaintiffs repeat and reallege all previous paragraphs as though fully set forth herein.

51. Defendant was an employee and agent of the PC and, ultimately, its Head of Sales. As such, Defendant owed the PC a duty of undivided loyalty, fidelity, honesty, good faith, and faithful performance of the responsibilities entrusted to him.

52. Defendant's senior position materially heightened the trust placed in him. Defendant had full leadership responsibility over the sales department and was expressly responsible for ensuring that sales personnel adhered to company processes and delivered results consistent with the Practice's business objectives.

53. Defendant substantially violated those duties by, among other things, repeatedly extending or causing unauthorized pricing concessions; disregarding established pricing and approval processes; failing to disclose conduct outside his authority; failing to disclose the full financial exposure his conduct created; and thereafter making false assurances concerning remediation in order to protect his employment and compensation.

54. Upon information and belief, Defendant's conduct was knowing, repeated, and motivated at least in part by his desire to maximize or preserve sales performance, protect his recently obtained Head of Sales position, preserve his $200,000 annual salary, remain eligible for substantial incentive compensation, and avoid the disciplinary consequences that truthful disclosure would have caused.

55. Defendant's conduct directly conflicted with his obligation to protect the PC's interests and his express responsibility to ensure adherence to the Practice's sales processes and constituted a substantial breach of the duty of loyalty and good faith owed to his employer.

56. Defendants Kelley's conduct was averse to the PC's interests and substantially violated the terms and essential purpose of his employment during the period of disloyalty.

57. By reason of Defendant's faithlessness, the PC is entitled to forfeiture and disgorgement of the salary, incentive compensation, commissions, and other compensation paid to Defendant during the period of his disloyalty, in an amount to be established through payroll and financial records and at trial.

**SECOND CAUSE OF ACTION**
**(Breach of Fiduciary Duty — On Behalf of PC)**
**(***pleaded in the alternative to the First Cause of Action***)**

58. Plaintiffs repeat and reallege all previous paragraphs as though fully set forth herein.
59. Defendant occupied a position of substantial managerial authority, discretion, and trust as the Practice's Head of Sales. Defendant was entrusted with responsibility over the sales department, patient-facing sales personnel, sales processes, patient relationships, sales performance, and revenue-generating activity.
60. Defendant expressly assumed responsibility for ensuring that personnel under his control adhered to the Practice's processes. Those responsibilities placed Defendant in a position of trust and imposed upon him fiduciary duties of loyalty, candor, honesty, good faith, and faithful exercise of the authority entrusted to him.
61. Defendant breached those duties by knowingly acting outside his pricing authority, causing or permitting unauthorized discounts, failing to comply with established processes, failing to disclose the resulting exposure, concealing material facts concerning the scope of his conduct, and falsely representing that he would remedy the consequences once his conduct began to surface.
62. Upon information and belief, Defendant acted knowingly and for purposes adverse to the Practice's interests, including protecting his recently obtained managerial position and compensation and avoiding the employment consequences that complete disclosure of his conduct would have caused.
63. As a direct and proximate result, the PC sustained actual pecuniary loss, including reduced or impaired patient receivables, unauthorized discounts, losses associated with affected patient transactions, and other economic injury to be established through the Practice's books and records and at trial.
64. This cause of action is pleaded in the alternative to the First Cause of Action and seeks the PC’s independently recoverable pecuniary losses caused by Defendant’s breaches, rather than solely forfeiture of Defendant’s compensation.

**THIRD CAUSE OF ACTION**
**(Common-Law Fraud — On Behalf of Dr. Emer Individually and the PC)**

65. Plaintiffs repeat and reallege all previous paragraphs as though fully set forth herein.

66. On or about September 24, 2025, Defendant Mason Kelley personally made materially false representations directly to Dr. Emer concerning Defendant's unauthorized pricing activity.
67. Specifically, Defendant represented that he would "call the patient," "own the pricing error," and "cover the difference."
68. Defendant made those representations through direct written electronic communications and oral communications with Dr. Emer while Dr. Emer was investigating Defendant's pricing conduct and determining whether Defendant should be immediately terminated and whether immediate corrective intervention was necessary.
69. The representations were materially false and misleading because Defendant did not intend to perform the promised remediation and, upon information and belief, simultaneously withheld the material existing fact that Defendant's unauthorized pricing conduct extended beyond the particular pricing error then being discussed.
70. Upon information and belief, Defendant knew his representations were false or misleading when made. Defendant personally knew the pricing transactions he had undertaken or caused; knew whether they had been authorized; knew whether additional unauthorized discounts existed; and knew whether he actually intended to contact affected patients, correct the errors, or personally cover the resulting difference.
71. Defendant possessed a concrete motive to deceive Dr. Emer. Only weeks earlier Defendant had been promoted to Head of Sales, his annual salary had increased to approximately $200,000, and his incentive-compensation structure afforded him the opportunity to earn substantial additional compensation based upon the sales department's collected revenue.
72. Upon information and belief, Defendant understood that complete and truthful disclosure of the scope of his unauthorized conduct would likely cause his immediate termination and loss of that salary, position, and incentive-compensation opportunity.
73. Defendant therefore intended that Dr. Emer rely upon the September 24 representations by allowing Defendant additional time to remain employed and purportedly remedy his conduct rather than terminating him and immediately assuming personal control of the affected accounts.
74. Defendant's September 24, 2025, fraudulent representations and omissions were distinct from the underlying unauthorized pricing conduct. The fraud occurred after portions of Defendant's unauthorized conduct had begun to surface and induced Plaintiffs to take—or refrain from taking—additional action that they otherwise would not have taken, thereby

causing reliance-based losses separate from the economic consequences of the underlying unauthorized discounts.

75. Having undertaken to explain the pricing discrepancy and affirmatively represented that he would remedy it, Defendant was obligated not to render those statements materially misleading by withholding facts within his knowledge concerning additional unauthorized pricing activity and the true magnitude of the problem.

76. The undisclosed pricing information was peculiarly within Defendant's knowledge because Defendant personally generated, authorized, communicated, or caused the affected pricing transactions, while Dr. Emer had not yet discovered their full scope. Having chosen to speak concerning the pricing problem and its remediation, Defendant could not truthfully present the matter as an isolated, remediable pricing error while withholding material facts that rendered his affirmative statements misleading.

77. Dr. Emer actually and reasonably relied upon those representations and temporarily refrained from immediately terminating Defendant and undertaking all available corrective measures himself.

78. In reliance upon Defendant's assurances and while Defendant purportedly was going to resolve the pricing problems, Dr. Emer personally used his own money to satisfy operating obligations affected by the resulting shortfall, including payroll, rent, and other fixed expenses.

79. Those expenditures constituted actual out-of-pocket pecuniary loss to Dr. Emer individually. The funds belonged to Dr. Emer personally, were paid from his individual assets and accounts, and reduced his personal assets dollar-for-dollar. Dr. Emer's injury is therefore distinct from a claim based merely upon diminution in the value of his ownership interest in the PC.

80. Had Defendant truthfully disclosed the full circumstances of his conduct and his lack of intention to perform the promised remediation, Dr. Emer would have immediately terminated Defendant, personally taken control of affected patient accounts, pursued available corrective and mitigation measures without awaiting Defendant's promised cure, and would not have continued acting and making personal expenditures in reliance upon Defendant's false assurances.

81. The PC separately relied upon Defendant's representations through Dr. Emer, its sole shareholder, director, and principal physician, including by temporarily permitting Defendant to remain employed and compensated and delaying complete corrective intervention.

82. As a direct and proximate result of Defendant's fraud, Dr. Emer sustained actual out-of-pocket pecuniary losses consisting of personal funds expended during the period of reliance following Defendant's September 24 representations, in an amount to be established through banking, payroll, accounting, and other records. During the overall period affected by Defendant's misconduct, Dr. Emer personally expended up to approximately $150,000.

83. The PC separately sustained losses attributable to its reliance, including compensation paid to Defendant during the period of continued employment and losses associated with affected transactions that became fixed, increased, or could no longer be mitigated during the period in which Plaintiffs relied upon Defendant's purported remediation.

84. Defendant's conduct was intentional, calculated, and undertaken for his own financial and employment benefit and with knowledge that Plaintiffs would suffer economic injury from reliance upon his false assurances and concealment.

## PRAYER FOR RELIEF

85. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant as follows:
    A. On the First Cause of Action, forfeiture and disgorgement in favor of the PC of all salary, commissions, incentive compensation, and other compensation paid to Defendant during the period of his disloyalty, in an amount to be established at trial;
    B. On the Second Cause of Action, compensatory damages in favor of the PC for its actual pecuniary losses caused by Defendant's breaches of fiduciary duty, and other equitable relief to the extent permitted by law and not duplicative of the relief awarded under the First Cause of Action;
    C. On the Third Cause of Action, compensatory damages in favor of Dr. Emer individually for his actual out-of-pocket pecuniary losses caused by his reliance upon Defendant's fraudulent representations and omissions, and compensatory damages in favor of the PC for its separately sustained reliance-based losses, together with punitive damages to the extent permitted by law;
    D. Pre- and post-judgment interest, costs, and disbursements; and
    E. Such other and further relief as the Court deems just and proper.

Dated: Brooklyn, New York
August 24, 2026

Respectfully Submitted,

*/s/ Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.
T.A. BLACKBURN LAW, PLLC
1242 East 80th Street, 3rd Floor
Brooklyn, New York 11236
Tel: (347) 342-7432
Email: tblackburn@tablackburnlaw.com
Attorneys for Plaintiffs

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues and causes of action so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure and, to the extent this action is remanded to the Supreme Court of the State of New York, County of New York, pursuant to Sections 4101 and 4102 of the New York Civil Practice Law and Rules. Plaintiffs' demand for a jury trial is made without waiver of, and expressly subject to, Plaintiffs' pending Motion to Remand and their contention that this Court lacks subject-matter jurisdiction.

Dated: Brooklyn, New York
August 24, 2026

Respectfully Submitted,

*/s/ Tyrone A. Blackburn, Esq.*

Tyrone A. Blackburn, Esq.
T.A. BLACKBURN LAW, PLLC
1242 East 80th Street, 3rd Floor
Brooklyn, New York 11236
Tel: (347) 342-7432
Email: tblackburn@tablackburnlaw.com
Attorneys for Plaintiffs